UNITED STATES, Appellee

v.

Joshua P. LOVETT, Staff Sergeant
U.S. Air Force, Appellant

No. 03-0072

Crim. App. No. 33947

United States Court of Appeals for the Armed Forces

Argued    October 21, 2003
Decided   February 3, 2004

CRAWFORD, C.J., delivered the opinion of the Court, in
which GIERKE, EFFRON, BAKER, and ERDMANN, JJ., joined.


Counsel

For Appellant: Mr. Norman R. Zamboni, Esq. (argued); Colonel
Beverly B. Knott, Major Karen L. Hecker, Major Andrew S.
Williams, and Captain James M. Winner (on brief); Major Terry L.
McElyea.

For Appellee: Major John C. Johnson (argued); Colonel LeEllen
Coacher, Lieutenant Colonel Robert B. Combs, and Captain Kevin
P. Stiens (on brief); Colonel Anthony P. Datillo, Lieutenant
Colonel Lance B. Sigmon, and Major Linette I. Romer.

Military Judge: B. T. Brown and L. S. Murnane.


**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**.

Chief Judge CRAWFORD delivered the opinion of the Court.

On May 12 and July 12-17, 1999, Appellant was tried by general court-martial at Shaw Air Force Base (AFB), South Carolina.  Contrary to his pleas, Appellant was convicted of wrongful possession of Percocet, rape, and soliciting the commission of an offense to the prejudice of good order and discipline, in violation of Articles 112a, 120, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 912a, 920, and 934 (2000), respectively.

Appellant was sentenced to a dishonorable discharge, confinement for 15 years, total forfeiture of all pay and allowances, and reduction to pay grade E-1.  The convening authority approved the sentence as adjudged and waived the forfeitures for six months for the benefit of Appellant's family.

On September 9, 2002, the Air Force Court of Criminal Appeals (CCA) affirmed the findings and sentence in an unpublished opinion.  United States v. Lovett, ACM No. 33947 (A.F. Ct. Crim. App. Sept. 9, 2002).  This Court has granted review of the following issues:

    I.    WHETHER THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE HEARSAY STATEMENTS MADE BY APPELLANT'S WIFE, MM, AND LC, AND BY EXCLUDING, AS HEARSAY, EXCULPATORY EVIDENCE OFFERED BY APPELLANT.

    II.    WHETHER THE MILITARY JUDGE ERRED BY INSTRUCTING
           THE PANEL THAT THE MAXIMUM SENTENCE WAS LIFE
           WITHOUT PAROLE WHEN THAT PUNISHMENT WAS NOT AN
           AUTHORIZED SENTENCE AS ITS IMPLEMENTATION HAD NOT
           YET BEEN ORDERED BY THE PRESIDENT, OR, IN THE
           ALTERNATIVE, WHERE INSUFFICIENT EVIDENCE WAS
           PRESENTED AT TRIAL TO PROVE THAT ANY ALLEGED ACTS
           OF RAPE HAD OCCURRED AFTER 19 NOVEMBER 1997.

    III. WHETHER APPELLANT'S CONVICTION FOR SOLICITATION
           SHOULD BE SET ASIDE BECAUSE (1) IT FAILS TO STATE
           AN OFFENSE, (2) IT IS NOT A LESSER INCLUDED
           OFFENSE OF SOLICITATION TO COMMIT MURDER, OR (3)
           THERE IS A FATAL VARIANCE BETWEEN THE CHARGED
           SPECIFICATION AND THE FINDINGS.

For the reasons set forth below, we affirm as to Issue I and reverse as to Issue III. Because we grant Appellant relief on Issue III, we need not address Issue II.

## FACTS

Appellant and his wife (TL) married in 1994. TL had a son (CF) and daughter (MM) from previous relationships. TL testified that in the spring of 1997, when MM was five years old, MM told TL that Appellant was "touching" her. When TL confronted Appellant with this accusation, he denied that this ever occurred.

During the following school year (1997-98), MM developed a friendship with another little girl (DI) in her kindergarten class. The girls played together and occasionally they would sleep at each other's homes. On one occasion, DI's mother observed MM pulling up her dress and dropping her underwear. Later, DI told her mother that MM had been showing boys her

3

"privates" and telling a boy at school that he should be kissing DI's "privates." DI's mother relayed the incident to TL. Around October 24, 1998, DI's mother again observed MM engage in overtly sexual behavior. During a sleepover at DI's house, the girls went to DI's bedroom and locked the door. When they became very quiet, DI's mother unlocked the door and discovered MM lying on the bed with her nightgown pulled up and DI pretending to give her a shot in the genital area with a toy hypodermic needle. The next morning, DI's mother told TL about the incident and suggested that she find out why MM had been behaving in such a sexual manner.

Following TL's conversation with DI's mother, TL questioned MM about her behavior, asking whether anyone had ever touched her. MM first responded that the doctor had touched her, but after further questioning from TL, MM eventually admitted that "Daddy put his private in [my] tushy." TL immediately called a friend, LS, who came to the house and asked MM to tell her what she had told her mother. MM revealed additional information to LS, who then took MM to the emergency room at Shaw AFB. There, the pediatric nurse practitioner who examined MM found a defect in her hymen that was consistent with some form of penetration.

At trial, MM testified (after TL, but before LS) that Appellant on many occasions "stuck his private up my private" while the two were in Appellant's bedroom and study. MM also

4

testified that it hurt when Appellant did this, that Appellant used a bottle of lotion during these acts, and that Appellant told her not to tell anyone.  MM had previously told a victim's advocate that Appellant started doing this to her when she was five years old.

MM's brother, CF, also testified at trial (after TL, MM, and LS) that Appellant frequently took MM into his (Appellant's) bedroom or the study.  CF said he was not permitted to enter the room, even if he knocked on the door.  CF further testified that he heard MM crying when she was alone with Appellant, and that he sometimes saw a bottle of lotion in the room after MM and Appellant left.

In addition to raping MM, Appellant was charged with soliciting a man (LC) to murder TL "by telling [LC] that he wanted his wife to disappear, providing [LC] a picture to identify the said [TL], and discussing how much it would cost to have [LC] make the said [TL] disappear."  LC testified that Appellant told him that he wanted TL to disappear.  He further testified that Appellant gave him a picture of TL, her car keys, and discussed how much this would cost.

After evidence was presented, the Government requested that the military judge instruct the members on the lesser-included offenses of the solicitation specification, including the lesser-included offense of soliciting a general disorder in

violation of Article 134.  In response, the military judge

proposed an instruction that would identify the following

elements of the lesser-included offense: that "[Appellant]

solicited [LC] to take some action to cause [TL] to disappear or

to fail to appear in court[,]" and "that under the circumstances

[Appellant's] conduct . . . was to the prejudice of good order

and discipline in the armed forces or was of a nature to bring

discredit upon the armed forces."  Appellant objected to this

proposed instruction.  Over this objection, the military judge

instructed the members on the general disorder lesser-included

offense, in pertinent part, as follows:

> [I]t must be proven beyond a reasonable doubt that the
> accused intended that [LC] commit every element of
> this offense.  Those elements are as follows: first,
> that at the time and place alleged, the accused or
> [LC] engaged in a specific act for the purpose of
> wrongfully causing [TL] to be unable to appear at a
> scheduled proceeding in a criminal or civil trial; and
> second, that, under the circumstances the conduct of
> the accused was to the prejudice of good order and
> discipline in the armed forces or was of a nature to
> bring discredit upon the armed forces.

After deliberations, the members excepted out "murder" from

the specification and found Appellant guilty of the "general

disorder" of

> soliciting the commission of an offense to the
> prejudice of good order and discipline . . . in that
> [Appellant] . . . did . . . wrongfully solicit [LC] to
> cause [TL] to disappear or to wrongfully prevent her
> from appearing in a civil or criminal proceeding . . .
> by telling [LC] he wanted his wife to disappear,
> providing [LC] the keys to [TL's] car, a picture to

6

identify the said [TL] and by discussing how much it would cost to make the said [TL] disappear.

## DISCUSSION

I.   WHETHER THE MILITARY JUDGE ERRED BY ADMITTING INTO EVIDENCE HEARSAY STATEMENTS MADE BY APPELLANT'S WIFE, MM, AND LC, AND BY EXCLUDING, AS HEARSAY, EXCULPATORY EVIDENCE OFFERED BY APPELLANT.

Appellant claims that the military judge erred in admitting, under hearsay exception rules, hearsay contained in TL's written statement and LS's in-court testimony.  Appellant also argues that the military judge erred in excluding, on hearsay grounds, exculpatory testimony from LC.

Appellant's first complaint concerns Prosecution Exhibit (PE) 12, consisting of a written statement made by TL to the Air Force Office of Special Investigations (AFOSI) on November 24, 1998.  In the statement TL described how she questioned MM about whether Appellant abused her, and claimed that MM responded that Appellant put his "private" in her "tushy."  TL also stated that when she asked CF if he ever observed Appellant display inappropriate behavior toward MM, CF responded that Appellant often took MM downstairs alone while CF had to remain upstairs.

The exhibit was originally marked as Defense Exhibit I for identification, and was used in this form by the defense counsel to cross-examine TL.  On redirect, trial counsel offered TL's written statement as a PE 12 for his own use.  This exhibit was generally consistent with TL's affidavit furnished to the pre-

7

trial investigator, originally marked DE J for identification and subsequently admitted as PE 13.  Appellant did not object to the admission of PE 13.  Appellant did object to PE 12, claiming it contained uncharged misconduct and hearsay statements.  Regarding the hearsay objection, the judge extensively discussed the statements' admissibility under Military Rule of Evidence 801(d)(1)(B) [hereinafter M.R.E.] , as prior consistent statements.  Over defense objection, the military judge admitted PE 12 under M.R.E. 801(d)(1)(B).  In summarizing her ruling on PE 12 for the record, the judge noted, in the alternative, that the statements in PE 12 would also qualify as residual hearsay under M.R.E. 807:

> With regard to Prosecution Exhibit 12, I'm overruling the defense objection to Prosecution Exhibit 12 under 80 – Military Rule of Evidence 801(d)(1), and should I be mistaken that 801(d)(1) actually applies, I find there are also sufficient circumstantial guarantees of trustworthiness in that the witness has taken the stand and has been subjected to cross-examination on the statement under oath, and therefore, I would find that it is also admissible under Military Rule of Evidence 807, should I be mistaken in my analysis under 801(d)(1).

M.R.E. 807 provides as follows:

> A statement not specifically covered by Rule 803 or 804 [which describe exceptions to the hearsay rule] but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than other evidence which the proponent can procure through reasonable efforts; and (C) the

> general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Defense counsel did not object to the judge's alternative conclusion as to the admissibility of PE 12 under M.R.E. 807.

Appellant also challenges portions of LS's in-court testimony -- which occurred after MM's trial testimony -- regarding her October 25 conversation with MM, during which she claimed MM stated that Appellant "put his private in her tush" and touched her "tee-tee." At trial, defense counsel objected to this testimony on hearsay grounds, generally noting its prior argument based on M.R.E. 807, which Appellant had earlier advanced regarding hearsay statements contained in TL's in-court testimony. Trial counsel countered the objection by referring to its own earlier arguments on residual hearsay. The judge then summarily overruled defense counsel's objection, without explanation. During the previous residual hearsay discussion to which both counsel referred, the military judge had articulated that MM's hearsay statements contained in TL's in-court testimony were material and more probative on the point for which they were offered than any other evidence the proponent could procure through reasonable efforts.

Appellant finally argues that LC offered exculpatory testimony, which the military judge erroneously excluded on hearsay grounds. At trial, the Government asked LC how he

9

obtained the job he was currently holding, whether he knew a friend of TL's, whether he was ever threatened regarding his testimony at Appellant's court-martial, and whether he threatened anyone else. On cross-examination, defense counsel asked LC whether Appellant told him that he "didn't want any harm to come to his wife." Trial counsel objected on hearsay grounds. An Article 39(a) session was called, the members were excused, and LC testified that he could not recall if Appellant told him he did not want TL physically harmed. Defense counsel argued that the statement was not offered for the truth of the matter asserted, but rather to show whether LC actually felt that Appellant was serious about having TL murdered, and that therefore the statement fell within the state-of-mind exception to the hearsay rule, under M.R.E. 803(3). The military judge sustained trial counsel's objection and refused to allow defense counsel to inquire further as to the meaning of Appellant's solicitation request.

We hold that even assuming the judge erred in receiving the hearsay statements within PE 12 into evidence, in overruling defense counsel's objection to LS's hearsay testimony, and in not permitting defense counsel to question LC about whether Appellant did not want TL harmed, any such errors were harmless. See Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2002) ("A finding or sentence of court-martial may not be held incorrect on the

ground of an error of law unless the error materially prejudices the substantial rights of the accused.").

Regarding MM's hearsay statement in PE 12, TL had already testified about the statement -- without defense objection -- during direct examination. Moreover, before PE 12 was offered by the Government, the defense used it as its own exhibit, admitted for identification, to cross-examine TL about MM's statement to her. The same statement was also contained in PE 13 -- the summary of TL's testimony in a proceeding pursuant to Article 32, UCMJ, 10 U.S.C. § 832 (2000) -- which was admitted without objection by the defense, and was also used by the defense to cross-examine TL, as an exhibit admitted for identification. As to CF's hearsay statement in PE 12, although CF had not yet testified at the time PE 12 was admitted, he testified and was cross-examined shortly thereafter, in a manner consistent with his statement in PE 12. Regarding MM's hearsay statement contained in LS's in-court testimony, by the time LS testified at trial, the court members already had this evidence before them through MM's own trial testimony.

In sum, Appellant suffered no prejudice from the admission of hearsay statements contained in PE 12 and LS's trial testimony. The hearsay statements were addressed without defense objection during TL's direct examination, were used by the defense to cross-examine TL, were consistent with and

11

cumulative of the declarants' own in-court testimony, and were contained in PE 13, which was admitted without defense objection. See United States v. Gunkle, 55 M.J. 26, 30 (C.A.A.F. 2001)(noting this Court's reluctance to find reversible error where the challenged information is simply cumulative of the victim's own in-court testimony).

Finally, the judge's failure to permit defense counsel to question LC regarding Appellant's exact intentions was harmless. Indeed, the court members ultimately found that Appellant did not solicit LC to murder TL -- but rather only to commit an act prejudicial to good order and discipline. In sum, counsel's inability to probe LC to show that he did not solicit murder could not have been prejudicial to Appellant.

Thus, we affirm the decision of the CCA as to Issue I, holding in agreement with the CCA that any errors on the part of the military judge were harmless.

II. WHETHER APPELLANT'S CONVICTION FOR SOLICITATION SHOULD BE SET ASIDE BECAUSE (1) IT FAILS TO STATE AN OFFENSE, (2) IT IS NOT A LESSER INCLUDED OFFENSE OF SOLICITATION TO COMMIT MURDER, OR (3) THERE IS A FATAL VARIANCE BETWEEN THE CHARGED SPECIFICATION AND THE FINDINGS.

Appellant was charged, in part, with soliciting LC to murder TL, for telling LC that he wanted TL to disappear, for providing LC with a picture of TL, and for discussing with LC how much it would cost to have TL disappear. The members

12

excepted out "murder" from the specification and found Appellant

guilty of the "general disorder" of

> soliciting the commission of an offense to the
> prejudice of good order and discipline . . . in that
> [Appellant] . . . did . . . wrongfully solicit [LC] to
> cause [TL] to disappear or to wrongfully prevent her
> from appearing in a civil or criminal proceeding . . .
> by telling [LC] he wanted his wife to disappear,
> providing [LC] the keys to [TL's] car, a picture to
> identify the said [TL] and by discussing how much it
> would cost to have [LC] make the said [TL] disappear.

Appellant now argues that this variance between the charge

and findings was significant enough to have prevented him from

adequately preparing a defense. In essence, Appellant claims

that defending against a charge of soliciting murder is not the

same as defending against a charge of soliciting the commission

of a general disorder. Appellant avers that because of this

difference, he was not "on notice" -- and therefore not prepared

-- to defend against the offense of which he was convicted. We

agree with Appellant, and hold that there was a fatal variance

between the charged specification and the findings.

"A variance between pleadings and proof exists when

evidence at trial establishes the commission of a criminal

offense by the accused, but the proof does not conform strictly

with the offense alleged in the charge." United States v.

Allen, 50 M.J. 84, 86 (C.A.A.F. 1999). Nevertheless, the Rules

for Courts-Martial authorize findings by exceptions and

substitutions, with the caveat that they "may not be used to

substantially change the nature of the offense or to increase the seriousness of the offense or the maximum punishment for it." Rule for Courts-Martial 918(a)(1). See also United States v. Wray, 17 M.J. 375, 376 (C.M.A. 1984).

Minor variances that do not change the nature of the offense are not necessarily fatal. See United States v. Hunt, 37 M.J. 344, 347-48 (C.M.A. 1993)(date of rape charged as "on or about"); United States v. Willis, 50 M.J. 841 (A. Ct. Crim. App. 1999)(change in language alleged to be false under Article 107 violation not material). "Where, however, an appellant can demonstrate that a variance is material and that he or she was prejudiced, the variance is fatal and the findings thereon can not stand." United States v. Teffeau, 58 M.J. 62, 66 (C.A.A.F. 2003)(concluding that the variation between the charge of violating a general order by providing alcohol to a recruit and the findings that the accused wrongfully engaged in and encouraged a nonprofessional, personal relationship with the recruit was material because it deprived the accused of the opportunity to defend against the charge).

Prejudice can arise from a material variance in several ways:

> An appellant may show that the variance puts him at risk of another prosecution for the same conduct. An appellant may [alternatively] show that his due process protections have been violated where he was "misled to the extent that he has been unable

> adequately to prepare for trial," or where the
> variance at issue changes the nature or identity of
> the offense and he has been denied the opportunity to
> defend against the charge.

Id. at 67 (quoting United States v. Lee, 1 M.J. 15, 16 (C.M.A.
1975))(other citations omitted). We hold that the soliciting
murder charge did not put Appellant on notice to defend against
a lesser-included offense of soliciting the commission of
obstruction of justice. Consequently, there was a fatal
variance between the specification as charged and the members'
ultimate findings.

The original specification for solicitation to commit
murder read as follows:

> [D]id, at or near Sumter, South Carolina, between on
> or about 24 November 1998 and on or about 19 January
> 1999, wrongfully solicit [LC] to murder [TL], by
> telling [LC] that he wanted his wife to disappear,
> providing [LC] a picture to identify the said [TL],
> and discussing how much it would cost to have [LC]
> make the said [TL] disappear.

Court-Martial Order at 1 (emphasis added). The members'
findings on the above specification -- establishing Appellant's
solicitation conviction -- were returned as follows:

> Not Guilty, but guilty of the lesser included offense
> of soliciting the commission of an offense to the
> prejudice of good order and discipline in the armed
> forces as follows: in that [Appellant] did, at or near
> Sumter, South Carolina, between on or about 24
> November 1998 and on or about 19 January 1999,
> wrongfully solicit [LC] to cause [TL] to disappear or
> to wrongfully prevent her from appearing in a civil or
> criminal proceeding pending before a duly authorized
> court of the United States by telling [LC] that he

15

> wanted his wife to disappear, providing [LC] the keys
> to [TL]'s car, a picture to identify the said [TL],
> and discussing how much it would cost to make the said
> [TL] disappear.

(Emphasis added.)  In essence, Appellant was convicted of

soliciting the commission of obstruction of justice.

The offense of murder under Article 118, with which

Appellant was originally charged with soliciting, is as follows:

> Any person subject to this chapter who, without
> justification or excuse, unlawfully kills a human
> being, when he --
> (1) has a premeditated design to kill;
> (2) intends to kill or inflict great bodily harm;
> (3) is engaged in an act that is inherently
> dangerous to another an evinces a wanton disregard of
> human life; or
> (4) is engaged in the perpetration or attempted
> perpetration of burglary, sodomy, rape, robbery, or
> aggravated arson; is guilty of murder, and shall
> suffer such punishment as a court-martial may direct,
> except that if found guilty under clause (1) or (4),
> he shall suffer death or imprisonment for life as a
> court-martial may direct.

Appellant's original charge suggested a violation of clause (1),

in that "telling LC that he wanted his wife to disappear,

providing LC a picture to identify the said TL, and discussing

how much it would cost to have LC the said TL disappear" imply

premeditation on Appellant's part, and Appellant's specific

intent that such murder be committed.  Upon receiving this

charge, Appellant's defense team channeled its efforts in the

direction of solicitation of premeditated murder, in order to

defeat the Government's attempt to prove premeditated murder

beyond a reasonable doubt.  Indeed, assembling such a defense is what the charge put counsel "on notice" to do.

Given the explicit language of the charge, Appellant could not have anticipated conviction for a lesser-included offense of soliciting a person to wrongfully prevent her from appearing in a judicial proceeding.  Because he lacked notice to prepare an adequate defense, there was a fatal variance between the precise specification as charged, and the general findings as returned by the members.

The decision of the United States Air Force Court of Criminal Appeals is affirmed as to Charges I and III and their specifications, and set aside as to Charge II and the sentence. The case is returned to the Judge Advocate General for remand to the Court of Criminal Appeals, which may reassess the sentence or order a sentence rehearing.